BONNIE DUART *v.* DEPARTMENT OF CORRECTION
(SC 18476)

Rogers, C. J., and Palmer, Zarella, McLachlan, Eveleigh, Vertefeuille and Bear, Js.*

---

* This case originally was argued before a panel of this court consisting of Chief Justice Rogers, and Justices Palmer, Zarella, McLachlan and Eveleigh. Thereafter, Justice Vertefeuille and Judge Bear were added to the panel, and they have read the record and briefs and listened to the recording of oral argument.

Argued April 26, 2011—officially released January 24, 2012

*Leon M. Rosenblatt,* for the appellant (plaintiff).

*Gregory T. D'Auria,* solicitor general, with whom were *Antoria D. Howard,* assistant attorney general,

and, on the brief, *George Jepsen*, attorney general, *Richard Blumenthal*, former attorney general, *Margaret Q. Chapple*, assistant attorney general, and *Jane B. Emons*, former assistant attorney general, for the appellee (defendant).

*Kathleen Eldergill* filed a brief for the Connecticut Employment Lawyers Association as amicus curiae.

*Charles Krich* filed a brief for the commission on human rights and opportunities as amicus curiae.

*Opinion*

McLACHLAN, J. The issue before us in this certified appeal is whether a party seeking a new trial on the basis of alleged knowing and deliberate discovery misconduct must show that the result at a new trial would likely be different.[1] The plaintiff, Bonnie Duart, appeals, upon our grant of her petition for certification, from the judgment of the Appellate Court affirming the trial court's denial of the plaintiff's motion for a new trial. She claims that the rule that we set forth in *Varley* v. *Varley*, 180 Conn. 1, 428 A.2d 317 (1980), to determine whether a new trial should be granted on the basis of allegations that the judgment was obtained through fraud—which requires, inter alia, that the movant demonstrate a substantial likelihood that the result of a new trial will be different—does not apply to a motion for a new trial on the basis of alleged discovery misconduct by the nonmoving party.[2] She claims, therefore, that

[1] The issue certified stated: "Whether the rule of *Varley* v. *Varley*, 180 Conn. 1, 428 A.2d 317 (1980), which requires a movant to demonstrate that the results at trial would have been different, applies to posttrial motions alleging knowing and deliberate discovery misconduct." *Duart* v. *Dept. of Correction*, 293 Conn. 937, 981 A.2d 1078 (2009). We now rephrase the issue for ease of discussion.

[2] *Varley* requires the movant to establish the following: "(1) There must have been no laches or unreasonable delay by the injured party after the fraud was discovered. (2) There must have been diligence in the original action, that is, diligence in trying to discover and expose the fraud. (3) There must be clear proof of the perjury or fraud. (4) There must be a substantial likelihood that the result of the new trial will be different." *Varley* v. *Varley*,

the Appellate Court improperly applied the standard set forth in *Varley* in affirming the judgment of the trial court. We conclude that the *Varley* rule as reframed in this decision applies to motions for a new trial based on the discovery misconduct of the nonmoving party. Accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court set forth the following relevant facts and procedural history. "This case arises out of an employment dispute between the plaintiff, a lieutenant with the department of correction, and the defendant, [the department of correction]. On May 28, 2002, the plaintiff filed an amended complaint against the defendant. In count one, she alleged that the defendant discriminated against her on the basis of her gender and sexual orientation. In count two, the plaintiff alleged that the defendant retaliated against her after she filed a complaint of discrimination with the commission on human rights and opportunities (commission).[3]

"The plaintiff alleged the following facts in support of her claims. On October 7, 1999, the plaintiff's supervisor, Duane Kelley, wrote an incident report in which he alleged that the plaintiff was dating another female correction officer, Cynthia Bruner, who was in the same chain of command as the plaintiff.[4] Kelley published this incident report to the warden, Gurukaur Khalsa. Following the publication of the incident report, both Kelley and Khalsa began making false or grossly exaggerated allegations against the plaintiff. They harassed her about her hair, despite her continual compliance

supra, 180 Conn. 4. Only the fourth prong, requiring a different result, is at issue in this appeal.

[3] The plaintiff also had alleged that she was discriminated against because of her physical disability, namely, endometriosis, but withdrew that claim prior to trial.

[4] Romantic relationships between two people in the same chain of command are forbidden pursuant to the defendant's administrative directive 2.17.

with the rules governing hair length, and, at one point, Khalsa stated to the plaintiff that if she did not know how to put her hair up properly, she should get one of her many women friends to help her. The plaintiff understood this statement to be in reference to her sexual orientation. In addition, the plaintiff was accused falsely of being disrespectful to Kelley and was transferred to the third shift despite a medical condition that prevented her from working that particular shift.

"On April 24, 2000, the plaintiff filed her first complaint of discrimination with the commission and the federal Equal Employment Opportunity Commission. After she filed the complaint, the discrimination and harassment by Kelley and Khalsa became even more severe, as evidenced by the following events: (1) the plaintiff was suspended for five days under the pretext of not complying with the hair regulations and for supposed disrespectful behavior to Kelley; (2) the plaintiff received her first unsatisfactory evaluation and her pay raise was taken away; (3) the plaintiff was accused falsely of failing to follow procedures regarding sick days, scheduling training and storing facility keys; (4) the plaintiff was denied vacation time; (5) the plaintiff was demoted from her position of lieutenant; and (6) the plaintiff was transferred by another supervisor, Wayne Valade, to a different correctional facility, which resulted in a decrease in pay, authority and prestige. The plaintiff also alleged that both Valade and Kelley had a practice of harassing female officers." *Duart* v. *Dept. of Correction*, 116 Conn. App. 758, 760–62, 977 A.2d 670 (2009).[5]

A jury trial commenced on July 14, 2004. On July 27, 2004, the jury issued a verdict denying the plaintiff's claims of discrimination on the basis of gender, race

[5] In July of 2001, the plaintiff filed a second complaint with the commission asserting retaliation. In April of 2002, she elected to proceed in a civil action.

and sexual orientation. On August 6, 2004, the plaintiff filed a motion in arrest of judgment for extrinsic causes, to set aside the verdict and for a new trial. In support of her motion, the plaintiff relied on the defendant's failure to disclose an anonymous note accusing the plaintiff of being in a relationship with Bruner, developments in the defendant's investigation of a complaint by Lieutenant Catherine Osten that Kelley and Valade had retaliated against her, and a 2002 discrimination complaint filed by Lieutenant Lisa Jackson against Osten and Kelley.[6] Assuming, without deciding, that the defendant had engaged in discovery misconduct, the trial court concluded that the evidence at issue was "merely cumulative" of evidence presented at trial and, as such, "would not have produced a different result." The court applied the "result altering" standard as set forth in *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59* v. *Superline Transportation Co.*, 953 F.2d 17, 21 (1st Cir. 1992) (*Teamsters*), which requires the movant to show that it "possesses a potentially meritorious claim or defense which, if proven, will bring success in its wake," and denied the plaintiff's motion for a new trial.

The plaintiff appealed from the judgment of the trial court to the Appellate Court, claiming that the defendant's discovery misconduct had "so perverted the process" that it had deprived her of the opportunity to fully and fairly discover evidence, and that consequently she was entitled to a new trial. She argued that the trial court improperly applied the "result altering" standard set forth in *Teamsters*, and should have applied the "substantial interference" test set forth in *Anderson* v.

---

[6] The plaintiff's initial ground for seeking a new trial included newly discovered evidence. She filed a supplemental memorandum on June 5, 2007, adding discovery misconduct as an additional justification for a new trial. In this certified appeal, she advances only her claim of discovery misconduct.

*Cryovac, Inc.*, 862 F.2d 910, 926 (1st Cir. 1988), which requires the movant to show that "the misconduct substantially interfered with its ability fully and fairly to prepare for, and proceed at, trial."

The Appellate Court upheld the trial court's decision by applying the "result altering" standard as articulated in *Varley* for a motion for a new trial grounded upon evidence of fraud, rather than by applying First Circuit case law. The Appellate Court held that, although the trial court's memorandum of decision did not expressly set out the standard established in *Varley*, it had "effectively applied the correct standard" in determining that, even if the defendant had disclosed the evidence at issue, the evidence was unlikely to produce a different result. *Duart* v. *Dept. of Correction*, supra, 116 Conn. App. 772–73. This certified appeal followed.

The plaintiff argues that the *Varley* rule is inapposite because discovery misconduct is distinct from misconduct at trial, and she should not be required to prove that the result of a new trial will be different. Instead, she suggests that the court should adopt the standard articulated by the First Circuit in *Anderson* v. *Cryovac, Inc.*, supra, 862 F.2d 926, or by this court in *Ramin* v. *Ramin*, 281 Conn. 324, 915 A.2d 790 (2007). In response, the defendant contends that the Appellate Court properly concluded that the "result altering" standard in *Varley* applies to both claims of fraud and discovery misconduct. We agree with the defendant.

Practice Book § 16-35 authorizes motions for a new trial.[7] Historically, this court has recognized the difficulty of articulating a "precise rule" applicable to all

[7] Practice Book § 16-35 provides in relevant part: "[M]otions for new trials . . . must be filed with the clerk within ten days after the day the verdict is accepted; provided that for good cause the judicial authority may extend this time. The clerk shall notify the trial judge of such filing. Such motions shall state the specific grounds upon which counsel relies."

motions for new trials for verdicts against the evidence. *Laflin* v. *Pomeroy*, 11 Conn. 440, 445 (1836). In *Laflin*, we stated that while the court must not interfere with the "appropriate province of the jury," it was clear that it may exercise its authority to grant a new trial when necessary to serve the "great end of all trials, a fair and impartial administration of justice." Id. We further concluded that the "substantial ends of justice" would not require a new trial when it did not clearly appear that "the result would or ought to be different . . . ." Id.; see also *Wooster* v. *Glover*, 37 Conn. 315, 316 (1870) (denying petition for new trial when petitioner failed to show that injustice had been done, even though his default of appearance was not negligent, because "the result of a new trial would not probably be different" [internal quotation marks omitted]).

Over time and in a variety of contexts, this court consistently has required parties to demonstrate the likelihood of a different result to show that justice requires a new trial. For example, we have stated that the discovery of new evidence warrants a new trial if "upon all the evidence an injustice had been done," but that a new trial will not be granted upon newly discovered evidence "unless . . . a new trial would probably produce a different result." *Turner* v. *Scanlon*, 146 Conn. 149, 163, 148 A.2d 334 (1959).[8] Likewise, if the court improperly admitted evidence, we will not disturb the judgment without a showing that the ruling

[8] Although a *motion* for a new trial is at issue in this case, the same showing is required for a *petition* for a new trial pursuant to General Statutes § 52-270 in both civil and criminal cases. See *Kubeck* v. *Foremost Foods Co.*, 190 Conn. 667, 670, 461 A.2d 1380 (1983) (civil litigant seeking new trial based on newly discovered evidence bears burden of proving that evidence "is likely to produce a different result in a new trial"); see also *Skakel* v. *State*, 295 Conn. 447, 467, 991 A.2d 414 (2010) (criminal defendant seeking new trial based on newly discovered evidence has burden of proving new trial "is likely to produce a different result"); *Shabazz* v. *State*, 259 Conn. 811, 821, 792 A.2d 797 (2002) (same).

was "so harmful as to require a new trial," or, in other words, that the "ruling [likely affected] the result." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 128, 956 A.2d 1145 (2008).

This court has also granted motions for new trials "[w]here an unsuccessful party has been prevented, by fraud or deception, from exhibiting fully his case and shows that there never has been a real contest in the trial or hearing of the case . . . ." *Varley* v. *Varley*, supra, 180 Conn. 2; see also *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 107, 952 A.2d 1 (2008) (applying *Varley* standard to motion to open when new evidence allegedly showed that judgment was tainted by fraud). In *Varley*, we set forth a four factor test to determine when fraud during the trial process warrants relief from the judgment. The fourth factor of this test requires the moving party to demonstrate "a substantial likelihood that the result of the new trial will be different." *Varley* v. *Varley*, supra, 4.

Finally, the "different result" requirement also applies outside of the civil context. The United States Supreme Court has held that a prosecutor's failure to disclose evidence material to guilt or punishment violates due process, thereby entitling the defendant to a new trial. *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Relief will not be granted, however, unless there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). A " 'reasonable probability,' " in turn, means "a probability sufficient to undermine confidence in the outcome." Id.; see also *State* v. *Skakel*, 276 Conn. 633, 700, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006) ("the prejudice that the defendant suffered as a result

of the impropriety must have been material to the case, such that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict" [internal quotation marks omitted]), quoting *Kyles* v. *Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). *Brady* conditions relief on the "different result" requirement regardless of whether the failure to disclose was intentional or merely negligent, and regardless of the timing of the failure to disclose. *Brady* v. *Maryland*, supra, 87 (applying rule for first time to prosecutor's failure to disclose requested materials prior to trial, "irrespective of the good faith or bad faith of the prosecution"); see also *United States* v. *Agurs*, 427 U.S. 97, 110, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) ("[n]or do we believe the constitutional obligation is measured by moral culpability, or the willfulness, of the prosecutor").

Requiring a movant to demonstrate that there is a reasonable probability that a new trial likely would yield a different result is consistent with the "equitable principle that once a judgment is rendered it is to be considered final . . . ." *Steve Viglione Sheet Metal Co.* v. *Sakonchick*, 190 Conn. 707, 713, 462 A.2d 1037 (1983). The principle of finality requires that judgments be "left undisturbed by post-trial motions except for a good and compelling reason." Id. The United States Supreme Court has emphasized that relief may be granted when the underlying judgment was founded on fraud, but that such an exception to the "deep-rooted policy in favor of the repose of judgments" must be reserved for exceptional circumstances, such as when enforcement of the judgment is " 'manifestly unconscionable . . . .' " (Citation omitted.) *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U.S. 238, 244–45, 64 S. Ct. 997, 88 L. Ed. 1250 (1944). Otherwise, there might "never be an end to litigation." *Turner* v. *Scanlon*, supra, 146 Conn.

163. Thus, the presumption of finality is necessary to promote stability, protect reliance interests, and prevent overly burdensome and duplicative litigation.

Although this is the first time that this court has directly considered what showing is required for a new trial when there is claimed discovery misconduct, we believe that the "different result" criterion best comports with the "deep-rooted policy in favor of the repose of judgments"; *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, supra, 322 U.S. 244; and properly balances the burdens on both parties. Not requiring the movant to prove a different result would invite endless litigation and deplete judicial resources. Given the breadth of discovery in modern trial practice, it is inevitable that the movant could find some fault with the other party's compliance with broadly phrased discovery requests. If we obliged the nondisclosing party to prove harmlessness every time the moving party claimed that the nondisclosure constituted misconduct, we would impose an insupportable burden on the nonmoving party to disprove amorphous assertions, as in the present case, that the "entire case would have gone differently . . . ." Requiring a showing of a different result serves as a means of differentiating those cases in which the nonmoving party's alleged misconduct materially affected the resolution of the underlying case—and in which, accordingly, the increased burden and expense is thereby warranted—from those cases in which relitigation would be a pointless exercise.

Nor do we believe that requiring some showing of a different result would set too high of a hurdle for the movant such that parties who wrongfully withhold documents would evade penalty. If it is self-evident that the withheld document may reasonably lead to a different result, the content of the document alone is sufficient to meet the *Varley* test. If prejudice to the movant is not clear from the document itself, the burden of proof

is best shouldered by the movant, as she is in the best position to know how the nonmoving party's nondisclosure impaired her case, how the information might have altered her trial strategy, and what avenues might have been pursued.

And, finally, any suggestion that this standard invites noncompliance ignores the fact that discovery compliance is already regulated by the rules of practice. Practice Book §§ 13-7 and 13-10 make responses to interrogatories and requests for production mandatory, while Practice Book § 13-14 (a), in relevant part, permits the judicial authority, on motion, to "make such order as the ends of justice require" if a party fails to comply fully with its discovery obligations. Under § 13-14, the trial court has broad discretion "to fashion and impose sanctions for failure to comply with the rules of discovery" to meet the individual circumstances of each case. *Northeast Savings, F.A.* v. *Plymouth Commons Realty Corp.*, 229 Conn. 634, 638, 642 A.2d 1194 (1994).[9] In addition, rule 3.4 of the Rules of Professional Conduct provides in relevant part that "[a] lawyer shall not . . . (1) [u]nlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value . . . [or] (4) . . . fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party . . . ." An attorney who

---

[9] For example, in *Doe* v. *Saint Francis Hospital*, Superior Court, judicial district of Waterbury, Docket No. CV-08-5008551-S (August 1, 2011), the court granted the plaintiff's motion for sanctions after the defendant failed to produce documents in response to the plaintiff's discovery requests. The trial court awarded the plaintiff attorney's fees and costs related to the motion and ordered the defendant to review all prior discovery requests to determine whether it withheld any additional documents. The trial court also granted a joint motion for sanctions that had been filed by all of the plaintiffs with matters pending under the master case of *Roe* v. *Saint Francis Hospital*, Superior Court, judicial district of Waterbury, Docket No. CV-08-5008330-S (August 1, 2011), awarding the plaintiffs the opportunity to take additional depositions at the defendant's cost.

violates these rules will be subject to discipline. Rules of Professional Conduct 8.4, commentary. Together, these provisions serve to secure fair competition in the trial process by deterring deliberate discovery misconduct and by providing a remedy if misconduct nevertheless occurs.

We therefore conclude that a motion for a new trial based on discovery misconduct, like fraud, will not be granted unless the movant satisfies the test set forth in *Varley* v. *Varley*, supra, 180 Conn. 4. We take this opportunity, however, to rephrase the movant's burden in establishing the fourth prong of the *Varley* test with respect to all claims for relief that fall within the purview of *Varley*, including fraud and misconduct. Previously in this opinion, we described a variety of circumstances in which a movant may seek a new trial, and we set forth the differing linguistic formulations for the "different result" criterion corresponding to each context. For instance, *Varley* indicates that a movant must show "a *substantial likelihood* that the result of the new trial will be different." (Emphasis added.) *Varley* v. *Varley*, supra, 4. This articulation differs from the phrasing in *Brady* v. *Maryland*, supra, 373 U.S. 87, and its progeny, which requires a criminal defendant to demonstrate "a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Emphasis added.) *United States* v. *Bagley*, supra, 473 U.S. 682.

Upon consideration, we see no reason why the victim of fraud or discovery misconduct in a civil case should be treated more or less favorably than the victim of nondisclosure in a criminal case. Therefore, we disavow the phrasing employed in *Varley* and rephrase the fourth prong to require a movant to demonstrate a reasonable probability, rather than a substantial likelihood, that the result of a new trial will be different. Furthermore and consistent with *Brady*, we interpret " 'reason-

able probability' " to mean "a probability sufficient to undermine confidence in the outcome"; id.; or, in other words, that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles* v. *Whitley*, supra, 514 U.S. 435.[10] We recognize that this test may impose a somewhat less onerous burden on the movant than the "substantial likelihood" test in *Varley*. *Varley* v. *Varley*, supra, 180 Conn. 4. Nevertheless, we adopt this linguistic formulation because we believe that *Brady* articulates a more appropriate test.[11]

Although the trial court analyzed the plaintiff's motion for a new trial according to the standard set forth in *Teamsters*, rather than the *Varley* test as rephrased in this opinion, our review of the court's findings leads us to conclude that, even if the court had required a showing of a reasonable probability that the result of a new trial will be different, the plaintiff's

[10] This new formulation of the fourth prong of *Varley* brings the standard for new trials on grounds of fraud or misconduct into closer alignment with the standard for a petition for a new trial on grounds of newly discovered evidence in civil and criminal cases, although the two tests remain different. See *Kubeck* v. *Foremost Foods Co.*, 190 Conn. 667, 670, 461 A.2d 1380 (1983) (civil litigant seeking new trial based on newly discovered evidence bears burden of proving that evidence "is *likely* to produce a different result in a new trial" [emphasis added]); *Shabazz* v. *State*, 259 Conn. 811, 821, 792 A.2d 797 (2002) (holding that criminal defendant seeking new trial based on newly discovered evidence has burden of proving new trial "is *likely* to produce a different result" [emphasis added]).

[11] Although Justice Eveleigh in his dissent would employ a "burden shifting" framework in all cases of fraud and misconduct, we have repeatedly observed that "the only fact-finding efforts that actually turn on the *allocation* of [the] burden [of proof] are those in which the fact finder, after weighing the evidence, finds its mind in perfect equipoise. . . . In such a rare case, the allocation of the burden of persuasion to the party asserting the truth of the proposition at issue means that that party cannot prevail." (Citation omitted; emphasis in original.) *State* v. *Webb*, 238 Conn. 389, 508, 680 A.2d 147 (1996), aff'd after remand, 252 Conn. 128, 750 A.2d 448, cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000).

motion for a new trial could not have prevailed.[12] The plaintiff's motion for a new trial alleged that the following items had been withheld during discovery: (1) the anonymous note received by Kelley in October, 1999; (2) documents regarding Osten's retaliation complaint against Kelley and Valade; and (3) Jackson's discrimination complaint against Osten and Kelley. According to the trial court, "[t]here is no question that these documents were germane to the case and requested in discovery. There is also no question that none of these documents were produced by the defendant, although they should have been." The trial court carefully analyzed the undisclosed evidence and concluded that the withheld items were "merely cumulative to other evidence introduced at trial and would not have produced a different result."[13]

In finding that the undisclosed evidence was merely cumulative, the trial court concluded that the withholding of these three items made little, if any, difference to the outcome of the case. With respect to the note, the trial court concluded that the late disclosure "did not so taint the process as to in all equity warrant a new trial." The court reasoned that the note was cumulative of other evidence because "[m]ost of what the actual note had to contribute to the outcome was already before the jury, just not its exact language." Indeed, although the plaintiff argues that the "entire case would have gone differently, both in discovery and at trial," if the note had been disclosed sooner, the trial court found that both parties were aware of the note, had a rough idea of its contents for a considerable time prior to trial, and the plaintiff called the jury's attention

---

[12] Although the plaintiff in fact conceded that she could not establish that the results of a new trial would be different absent the discovery misconduct, we observe that she drew this conclusion on the basis of the unmodified *Varley* test and not as we have rephrased it in this opinion.

[13] In analyzing the undisclosed evidence, the court "assume[d] that there was discovery misconduct, even though none has yet been demonstrated."

to the note numerous times to support her claim of discrimination on the basis of sexual orientation. The plaintiff also examined Kelley, who testified that he had known of the plaintiff's sexual orientation before he received the note. Additionally, although the plaintiff states that she would have changed her strategy and theory of the case to focus on discrimination due to sexual orientation, she asserted discrimination based on sexual orientation in the first count of her amended complaint, and the trial court found that it was "at the core of the trial and articulated by counsel at the start." Further, to the extent that the plaintiff was surprised by the production of the actual note, she was granted a recess to consider what actions to take.

Similarly, with respect to the undisclosed results of the Osten investigation and the Jackson complaint, the trial court stated: "After reviewing the evidence at trial and the complaints in question, the court finds that these documents are cumulative of other evidence that was presented at trial." The trial court's finding that both items were cumulative is supported by the fact that Osten herself testified as to the contents of the complaint and the investigation at trial. The trial court pointed out that the discriminatory conduct Osten described to the jury was "the most salient part of the complaint and the most telling, had the jury concluded that it was a pattern of discriminatory conduct that . . . Kelley regularly engaged in." The subsequent actions that the defendant took to address Osten's allegations were, in contrast, merely "secondary . . . ." Lastly, the court found that neither the Osten investigation materials nor the Jackson complaint "discredit[ed] the testimony of [Kelley and Valade]." These findings compel the conclusion that the trial court believed that the withheld items could not reasonably be taken to put the plaintiff's whole case in such a different light as to undermine confidence in the outcome of the trial.

In addition to our review of the trial court's findings, we have examined the record as supplied to us, including the portions of the transcript filed. We note, however, that the plaintiff failed to file a complete copy of the trial transcript.[14] We are therefore limited in our review to the record presented and we are unable to find any evidence from which we can conclude that there is a reasonable probability that the result of a new trial would be different. Consequently, the plaintiff could not have prevailed even under our rearticulation of the proper standard.

Notwithstanding the fact that in virtually all other contexts—including cases in which the state intentionally violates a criminal defendant's constitutional right to exculpatory material—we have required a movant to meet the "different result" requirement, the plaintiff argues that a motion for a new trial on the basis of discovery misconduct implicates different policy concerns that outweigh the interest in finality, and, consequently, that she should not have to prove that the result of a new trial would be different. The plaintiff urges us instead to adopt the rule set forth in *Anderson* v. *Cryovac, Inc.*, supra, 862 F.2d 926.

According to the United States Court of Appeals for the First Circuit, "in motions for a new trial under the misconduct prong of [r]ule 60 (b) (3) [of the Federal Rules of Civil Procedure], the movant must show the opponent's misconduct by clear and convincing evidence. Next, the moving party must show that the misconduct substantially interfered with its ability fully and fairly to prepare for, and proceed at, trial." Id.[15]

---

[14] The rules of practice place the burden on the appellant to file a transcript of the proceedings not already on file "which the appellant deems necessary for the proper presentation of the appeal. . . ." Practice Book § 63-8 (a).

[15] Even if this court adopted the *Anderson* test, the trial court expressly stated that "the facts in this case do not support . . . a conclusion [that the nondisclosure substantially interfered with the plaintiff's ability to fully and fairly prepare for and proceed at trial]."

Alternatively, a showing by the movant that the misconduct was "knowing or deliberate" gives rise to a presumption of substantial interference. Id. The opposing party then bears the burden to rebut that presumption by a "clear and convincing demonstration that the consequences of the misconduct were nugacious." Id.

We decline the plaintiff's invitation to adopt the *Anderson* test for three reasons. First and foremost, this court is guided by Connecticut common law in resolving issues of state law. In contrast, *Anderson* is founded on federal procedural law. In particular, the court in *Anderson* relied on the text of rule 60 (b) (3) of the Federal Rules of Civil Procedure and federal decisional authority interpreting the same. Because the procedure for granting a new trial in Connecticut state courts is governed by Connecticut's rules of practice, relying on federal case law that construes an analogous, but not identical, federal rule would impinge on the carefully demarcated bounds of the relationship between state courts and federal courts that this country has preserved since the time of the founding. Accordingly, we have stated that "[i]t is axiomatic that courts in Connecticut adjudicating matters of state law are not bound by a test that a federal court must apply. In Connecticut, the rules of practice and procedure are defined in our Practice Book and controlling case law." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 292 Conn. 1, 53, 970 A.2d 656, cert. denied sub nom. *Bridgeport Roman Catholic Diocesan Corp.* v. *New York Times Co.*, 558 U.S. 991, 130 S. Ct. 500, 175 L. Ed. 2d 348 (2009). More particularly, "the federal rules of civil procedure and the federal court's interpretations thereon are not binding upon the state courts . . . ." *Mac's Car City, Inc.* v. *American National Bank*, 205 Conn. 255, 260, 532 A.2d 1302 (1987).[16] The federal test

---

[16] While it is true that a state court may look to federal law for guidance in the absence of Connecticut law; see *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 88, 931 A.2d 237 (2007); that is not necessary in the present

for a rule 60 (b) (3) motion is, simply put, irrelevant to this case. The plaintiff has not cited any persuasive rationale for overruling this state's controlling case law in the context of discovery misconduct uncovered during or after trial by engrafting decisional authority from another jurisdiction onto our rules of practice. Thus, we adhere to the common law of this state.

Second, we disagree with the plaintiff's attempt to distinguish *Varley* in her claim that misconduct by a party before trial is distinct from fraud at trial such that we must adopt a different test for misconduct claims. The plaintiff's claim draws two distinctions: the timing of the misconduct and the type of misconduct; i.e., fraud or discovery misconduct. The plaintiff's suggestion that fraud and discovery misconduct may neatly be distinguished by their timing is puzzling. We easily can envision either type of misconduct commencing before or during trial. Moreover, although the timing of the misconduct will have some bearing on the degree of harm suffered by the movant, the plaintiff offers no explanation as to why a different rule should apply based on timing alone.

As for the plaintiff's suggestion that we should apply a different rule to discovery misconduct as distinguished from fraud, the plaintiff offers no explanation as to what differences between the two types of misconduct would justify the application of different rules to each. Indeed, the fraud at issue in *Varley* does not appear significantly distinguishable from the misconduct alleged by the plaintiff in the present action. In *Varley*, the alleged fraud, which pertained to a "subject on which both parties presented evidence"; *Varley* v. *Varley*, supra, 180 Conn. 3; included false testimony, brib-

action. This court has already supplied a rule in *Varley*. The plaintiff has not petitioned this court to overrule *Varley*, nor do we find sufficient justification to distinguish it.

ery, misconduct of counsel, and misconduct of the state referee during the trial proceeding in which the movant was "present and participated at every stage . . . ." Id., 2–3 and 2 n.1. In the present action, the alleged misconduct consisted of the defendant's knowing and deliberate failure to disclose three separate sets of documents in violation of its duty to respond to the plaintiff's requests for production. The plaintiff has made no attempt to draw any meaningful distinction—nor do we discern any—between the fraud at issue in *Varley* and the discovery misconduct that forms the basis of her motion for a new trial.[17]

Furthermore, *Anderson* does not support the plaintiff's claim that we should apply different rules to fraud and discovery misconduct. As the court in *Anderson* explained, "fraud" and "misconduct" are related and overlapping types of wrong. See *Anderson* v. *Cryovac, Inc.*, supra, 862 F.2d 923. Given their similar nature, it is appropriate that rule 60 (b) (3) of the Federal Rules

---

[17] In fact, the plaintiff's motion appears to set forth the functional equivalent of a claim that the defendant engaged in fraudulent nondisclosure, a species of fraud. "Mere nondisclosure . . . does not ordinarily amount to fraud"; *Egan* v. *Hudson Nut Products, Inc.*, 142 Conn. 344, 347, 114 A.2d 213 (1955); however, fraudulent nondisclosure or suppression arises from a "failure to disclose known facts, and, as well, a request or an occasion or circumstance which imposes a duty to speak." *Ceferatti* v. *Boisvert*, 137 Conn. 280, 283, 77 A.2d 82 (1950); see also *Billington* v. *Billington*, 220 Conn. 212, 215, 595 A.2d 1377 (1991) (where alleged fraud consisted of defendant's failure to disclose value of asset that defendant was obligated to disclose pursuant to rules of practice). The rules on discovery practice furnish such an occasion when a party is under a duty to speak. Practice Book § 13-7 (a) provides in relevant part that "interrogatories shall be answered" and Practice Book § 13-10 (a) provides in relevant part that a party receiving a request for production "shall serve" a response. It is clear from this language alone that compliance is mandatory, but the obligatory nature of discovery requests is further emphasized by the availability of sanctions for a party's failure to comply. See Practice Book § 13-14. It follows that when the plaintiff alleges that the defendant knowingly and deliberately concealed documents in the face of a duty to disclose the same, she in effect alleges the elements of fraudulent nondisclosure, and the *Varley* rule for fraud should therefore govern.

of Civil Procedure couples fraud and misconduct within the same subsection, and that the prevailing test for granting new trials under rule 60 (b) (3) among the federal courts applies equally to motions based on misconduct and to motions based on fraud. Id. ("the moving party must demonstrate misconduct—like fraud or misrepresentation—by clear and convincing evidence, and must then show that the misconduct foreclosed full and fair preparation or presentation of its case"). Thus, the federal rules provide the same test for relief regardless of whether the movant seeks a new trial on the basis of fraud or discovery misconduct. *Anderson*, therefore, supports our determination that we should apply a single test to both fraud and discovery misconduct.

Third, we believe that the rephrased *Varley* standard together with the availability of discovery sanctions strikes the proper balance between the burdens on the parties in the context of discovery misconduct claims. In *Anderson*, the court distinguished between intentional withholding of discovery, destruction of documents sought in discovery, and unintentional failure to disclose. While we have in many contexts addressed the difficulty of proving the intent of an actor, in this context it is not necessary to do so because it is the result of the nondisclosure rather than the intent that is important.[18] Having said that, there is no doubt that the intentional destruction or withholding of information, if shown, would aid the movant in showing the importance of the undisclosed information. In addition to the "smoking gun" document, the import of which is self-evident, obvious machinations surrounding the undisclosed information will permit an inference, not

[18] In his dissent, Justice Eveleigh's analogy of the present case to the interests at issue in spoliation cases conflates intentional destruction of evidence with mere nondisclosure, harms that differ vastly in nature and related policy concerns. Like subornation of perjury, not only is the nature of the harm different, but the nature of the act itself is more egregious.

unlike consciousness of guilt, that the nondisclosing party believed the information might lead to a different result.

Ultimately, a comparison of the *Anderson* and *Varley* tests leads to the conclusion that our standard in *Varley*, as restated with regard to the fourth prong, is the more appropriate. It is more likely that the ends of justice could be served consistently with our finality of judgments jurisprudence by granting the extraordinary relief of a new trial to a movant who can show a reasonable probability that the result of that new trial would be different, rather than to a movant who merely shows that the misconduct "substantially interfered with its ability fully and fairly to prepare for, and proceed at, trial." *Anderson* v. *Cryovac, Inc.*, supra, 862 F.2d 926. Consequently, we decline to follow *Anderson*, which follows the federal Rules of Civil Procedure, as it is unnecessary. We instead look to our common law, which provides adequate relief both in the instance of fraud and its closely related wrong, discovery misconduct.

The plaintiff also argues that if state law controls, the governing precedent is not *Varley*, but rather this court's decision in *Ramin* v. *Ramin*, supra, 281 Conn. 349. *Ramin*, however, is distinguishable from the present case. First, although *Ramin* involved discovery misconduct, the issue arose in a direct appeal and not a motion for new trial attacking a final judgment. Second, we relied heavily on the heightened duty to disclose in marital cases. See *Billington* v. *Billington*, 220 Conn. 212, 222, 595 A.2d 1377 (1991). Third, we expressly recognized in *Ramin* that the unique circumstances of that case, that is the defendant's egregious misconduct, which included repeated flouting of orders compelling discovery, required a departure from the general rule that "ordinarily the burden to establish harm is borne by the party who claims the error . . . ." *Ramin* v.

*Ramin,* supra, 348. A conclusion that *Ramin* established a general rule that whenever a party alleges discovery misconduct, the burden shifts to the nonmoving party to demonstrate harmlessness is simply a misreading of that decision.

First, the plaintiff in *Ramin* appealed from the judgment of the trial court dissolving her marriage; she did not file a motion for a new trial. Id., 326. Her appeal claimed that the trial court had abused its discretion when it refused to consider her motion for contempt and sanctions based on the defendant's failure to comply with discovery orders. Id., 327. Critical to our decision was our conclusion that the trial court's improper ruling deprived the plaintiff of discovery. We stated that it would be "grossly unfair" to require the plaintiff to establish how she was harmed by not having access to requested documents "to which she never gained access *solely as a result of the court's refusal* to consider her motion." (Emphasis added.) Id., 348. In the present case, the plaintiff has not alleged that the trial court bears any fault in the defendant's nondisclosure, nor does the record suggest any.

Additionally, our decision to shift the burden to the defendant to prove that his breach did not harm the plaintiff relied on the heightened duty to disclose in marital cases, set forth in *Billington.* Id., 349. In *Billington,* we recognized that "the settlement of a marital dissolution case is not like the settlement of an accident case"; *Billington* v. *Billington,* supra, 220 Conn. 221; and that considerations particular to the marital litigation context may outweigh the interests of finality and stability. Id., 222. Unlike civil litigants who stand at arm's length from one another, marital litigants have a duty of "full and frank disclosure" analogous to the "relationship of fiduciary to beneficiary . . . ." Id., 220; id., 221 ("[c]ourts simply should not countenance either party to such a unique human relationship dealing with

each other at arms' length"), quoting *Grayson* v. *Grayson*, 4 Conn. App. 275, 299–300, 494 A.2d 576 (1985) (*Borden, J.*, dissenting), appeal dismissed, 202 Conn. 221, 520 A.2d 225 (1987). As the "special relationship between fiduciary and beneficiary" in a fraud action compels "full disclosure by the fiduciary," marital litigants bear "no less" of a duty to disclose in a dissolution action. *Billington* v. *Billington*, supra, 221. Thus, in *Ramin*, the "fiduciary-like obligations of discovery" in the marital context formed the foundation for our decision to shift the burden of establishing harmlessness to the defendant. *Ramin* v. *Ramin*, supra, 281 Conn. 349–50. In the civil context, we have not held parties to such a heightened standard, and we decline to do so now.

Finally, even in the marital dissolution context, *Ramin* does not establish a general rule. Over the course of the proceedings in *Ramin*, the plaintiff filed five motions for contempt in response to which the court issued orders to comply, sanctions and attorney's fees against the defendant. Id., 330–31. The defendant's persistent failure to produce specifically requested documents prompted this court to describe his conduct as "egregious litigation misconduct . . . ." Id., 351. We expressly recognized that the particular facts of *Ramin*, because of the defendant's egregious misconduct, required a departure from the ordinary rule. *Ramin*, therefore, represents a narrow exception to the general rule that the party claiming error bears the burden to demonstrate harm.[19] By contrast, in the present case, the defendant's failure to disclose the anonymous note, the Osten investigation developments and the Jackson complaint do not rise to the level of egregiousness warranting a departure from our general rule, particularly

[19] For the same reasons, Justice Eveleigh's attempt, in his dissent, to extract general jurisprudential principles from *Ramin* can result only in a misapplication of our law.

when the trial court found that the plaintiff was generally aware of the contents of these documents. We therefore disagree with the plaintiff's suggestion that *Ramin* is controlling and conclude that it is inapplicable to the present case.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and PALMER, ZARELLA and BEAR, Js., concurred.

EVELEIGH, J., with whom VERTEFEUILLE, J., joins, dissenting. I respectfully dissent. I agree with the majority that the test set forth in *Varley* v. *Varley*, 180 Conn. 1, 428 A.2d 317 (1980), requires alteration. I disagree, however, with the majority's decision only to change the fourth prong of the test in *Varley* as applied to "motions for a new trial based on the discovery misconduct of the nonmoving party." I would overrule *Varley* in its entirety as it applies to all cases of this nature. For that reason, I disagree with the majority's resulting conclusion that a motion for a new trial based on discovery misconduct by the nonmoving party should not be granted unless the movant "demonstrate[s] a reasonable probability, rather than a substantial likelihood, that the result of a new trial will be different." In my view, the majority's placement of the burden on the party that was denied full disclosure during discovery to demonstrate a reasonable probability that unproduced or undisclosed information would alter the result at a new trial excuses, if not rewards, noncompliant behavior on the part of the opposing party, whether the plaintiff or the defendant, runs counter to the modern trend of requiring wrongdoers to shoulder the burden of establishing that their conduct did not aggrieve the innocent party, and fails to hold counsel to the high ethical standards set forth in our rules of practice.

Contrary to the majority, I would instead conclude that, when a party moves for a new trial on the basis of discovery noncompliance, that party must first establish by a fair preponderance of the evidence that there has been substantial noncompliance with a discovery request or order (i.e., nonproduction of one photograph in automobile accident case when other, similar photographs were produced would not be substantial), and that the noncompliance was relevant to the trial court's ultimate determination (i.e., defendant's noncompliance regarding plaintiff's question on damages would not be relevant to defendant's verdict on liability). Once this showing is satisfied, a rebuttable presumption should arise in favor of the movant that the unproduced or undisclosed information was material to the issues at trial, including the movant's full and fair preparation therefor. I would define materiality to mean, in this context, that if produced there was a reasonable possibility that the result of the trial could have been different. The burden would then fall on the allegedly noncompliant party to rebut the presumption and to demonstrate that the unproduced or undisclosed information was not material to the case (i.e., that if produced there was no reasonable possibility that the result of the trial could have been different). If the court finds that the presumption is not rebutted, the motion for a new trial should be granted. Accordingly, I would reverse the judgment of the Appellate Court and remand the case to that court with direction to remand the case to the trial court for further proceedings in accordance with this framework.

I begin by noting that I agree with the underlying facts and procedural history recited by the majority. I briefly highlight, however, the following relevant facts as either set forth in the majority opinion, in the trial court's memorandum of decision, or contained in the record. On March 31, 2003, the plaintiff, Bonnie Duart,

served requests for production on her employer, the defendant, the department of correction, seeking the plaintiff's "personnel file,"[1] as well as the personnel files of her supervisors, Duane Kelley and Wayne Valade, in connection with the plaintiff's claims of discrimination on the basis of gender and sexual orientation. The plaintiff also sought "all documents relating to complaints filed by [employees of the defendant] against [Kelley and Valade]." In response to these specific requests and others, the defendant disclosed information and produced various materials except for the three items that formed the basis of the plaintiff's motion for a new trial and prompted the subsequent appeals. First, the plaintiff claimed that the defendant did not disclose until the end of trial a so-called "anonymous note" alleging that the plaintiff was involved in a romantic relationship with another female officer in the same line of command. Second, the plaintiff claimed that the defendant failed to disclose developments in its investigation of a sexual discrimination complaint filed by Catherine Osten, a lieutenant of the defendant, in September, 2002, regarding alleged sexual harassment by Kelley and Valade. Third, the plaintiff claimed that the defendant failed to disclose the existence of a harassment complaint filed by Lisa Jackson, another lieutenant of the

---

[1] The plaintiff's discovery requests stated that "personnel file" was to be defined pursuant to General Statutes § 31-128a, which provides in relevant part: "(5) 'Personnel file' means papers, documents and reports, including electronic mail and facsimiles, pertaining to a particular employee that are used or have been used by an employer to determine such employee's eligibility for employment, promotion, additional compensation, transfer, termination, disciplinary or other adverse personnel action including employee evaluations or reports relating to such employee's character, credit and work habits. 'Personnel file' does not mean stock option or management bonus plan records, medical records, letters of reference or recommendations from third parties including former employers, materials that are used by the employer to plan for future operations, information contained in separately maintained security files, test information, the disclosure of which would invalidate the test, or documents which are being developed or prepared for use in civil, criminal or grievance procedures . . . ."

defendant, who was homosexual, against Kelley and Osten in September, 2002.

The trial court, in its memorandum of decision denying the plaintiff's motion for a new trial, concluded that the defendant's failure timely to disclose a copy of the actual anonymous note "did not so taint the process as to in all equity warrant a new trial" on the basis of the court's determination that, even if the defendant had disclosed the anonymous note to the plaintiff, the plaintiff failed to demonstrate that the note would have brought " 'success in its wake,' " or, in other words, would have resulted in a favorable verdict.[2] Although the trial court acknowledged that, "[a]dmittedly, [the] case had as its main focus discrimination on the basis of sexual orientation," it reasoned that the "general contents [of the note] alleging a romantic relationship with another female correctional officer was pointed out to the jury numerous times," "[t]he existence of the note was not hidden, [and] the central thrust of its contents had been known during the entire pendency of the case."

Regarding the defendant's failure to disclose the developments in the Osten complaint and the existence of the Jackson complaint, the trial court found that "[t]here is no question that these documents were germane to the case and requested in discovery. There is also no question that none of these documents were produced by the defendant, although they should have been. Certainly the details of the complaints could have been used to test the credibility of [Valade and Kelley] at trial." The trial court later "conclude[d] from

---

[2] In determining whether to grant the plaintiff's motion, the trial court relied on the test set forth in *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local 59* v. *Superline Transportation Co.*, 953 F.2d 17, 21 (1st Cir. 1992), pursuant to which the movant "must at least establish that it possesses a potentially meritorious claim or defense which, if proven, will bring success in its wake."

reviewing this after-discovered evidence that it, too, should have been produced during the discovery phase (except for the outcome of [Osten's] complaint, which only became known later) and had been properly requested." Thus, according to the trial court's express findings, the first prong of the test that I propose would have been satisfied. The trial court also noted that "the plaintiff was not dilatory in her efforts to secure all information she needed for the trial." As to the Osten complaint, the trial court concluded, however, that the undisclosed materials were cumulative because Osten had testified at trial and, therefore, the jury had before it the facts relating to her complaint against Valade and Kelley. The trial court noted, however, that the "gravamen of the after-discovered [Osten complaint] evidence . . . was not the complaint itself, but [rather] the action that the [defendant] took after [the Osten] investigation." Specifically, the defendant's investigation initially concluded that there was discriminatory conduct on the part of Kelley, although the trial court noted that this conclusion was eventually "overridden . . . ." The trial court reasoned, however, that because the final outcome of the Osten complaint was not known until after the trial in the present matter had concluded, this final outcome could not have been disclosed because it was not known. With regard to the undisclosed Jackson complaint, the trial court simply concluded that the "complaint filed by [Jackson] is also cumulative of other evidence at trial."

Motions for a new trial pursuant to Practice Book § 16-35[3] are "addressed to the sound discretion of the trial court and will never be granted except on substan-

---

[3] Practice Book § 16-35 provides in relevant part: "[M]otions for new trials . . . must be filed with the clerk within ten days after the day the verdict is accepted; provided that for good cause the judicial authority may extend this time. The clerk shall notify the trial judge of such filing. Such motions shall state the specific grounds upon which counsel relies."

tial grounds." (Internal quotation marks omitted.) *Bernier* v. *National Fence Co.*, 176 Conn. 622, 628, 410 A.2d 1007 (1979). Practice Book § 13-14 (a), which governs failures to comply with interrogatories and requests for production, provides in relevant part: "If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production . . . or has failed to comply with the provisions of Section 13-15 . . . or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require."[4] I note that the Practice Book provides for these sanctions, regardless of whether the failure to disclose was deemed to be intentional.

Pursuant to Practice Book § 16-35, I would conclude that "substantial grounds" exist warranting the granting of a motion for a new trial due to noncompliance under the following circumstances. First, the movant must demonstrate that the nonmoving party failed to comply with its obligations under Practice Book § 13-14 when the allegedly noncompliant party failed to disclose or produce information requested in discovery. This showing would require the movant to demonstrate that the

---

[4] Practice Book § 13-14 (b) provides in relevant part that such orders may include: "(1) The entry of a nonsuit or default against the party failing to comply;

"(2) The award to the discovering party of the costs of the motion, including a reasonable attorney's fee;

"(3) The entry of an order that the matters regarding which the discovery was sought or other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

"(4) The entry of an order prohibiting the party who has failed to comply from introducing designated matters in evidence;

"(5) If the party failing to comply is the plaintiff, the entry of a judgment of dismissal."

nonmoving party's substantial noncompliance was not a result of the discovery requests being susceptible to more than one reasonable interpretation. Second, the alleged substantial noncompliance must be relevant to the trial court's ultimate determination. Additionally, and consistent with the language of Practice Book § 13-14, I would conclude that whether the noncompliant party's failure to produce information in response to a discovery request was intentional, negligent or accidental is immaterial to the analysis of whether that party was, in fact, substantially noncompliant with the movant's discovery requests.[5] The manner of substantial noncompliance—for example, intentional misconduct—may subject the offending attorney to a grievance procedure. The effect on the innocent party, however, is the same: the material requested in discovery was not received and available for use in trial preparation and, if admissible, at trial. Upon a successful showing of relevant substantial noncompliance, a rebuttable presumption would arise in favor of the movant that the unproduced information was material to its case, including the movant's full and fair preparation therefore, in that there is a reasonable possibility that had the unproduced material or information been provided, the result of the trial could have been different. Thereafter, the noncompliant party would have the burden of rebutting the aforementioned presumption. Specifically, if the noncompliant party fails to demonstrate that the unproduced or undisclosed information was immaterial to the movant's case (i.e., that there is no

---

[5] I note that Practice Book § 13-14 has a new subsection (d), effective January 1, 2012, which provides: "The failure to comply as described in this section shall be excused and the judicial authority may not impose sanctions on a party for failure to provide information, including electronically stored information, lost as the result of the routine, good-faith operation of a system or process in the absence of a showing of intentional actions designed to avoid known preservation obligations." Obviously, the rule I propose does not apply to any failure to provide information excused under this new subsection.

reasonable possibility that the result of the trial could have been different), the motion for a new trial should be granted.

In devising this standard, I would explicitly overrule *Varley* v. *Varley*, supra, 180 Conn. 4,[6] as it relates to discovery noncompliance, whether intentional, negligent or accidental.[7] I believe that the concerns expressed in *Varley* are adequately addressed by the Practice Book, time limitations on motions for a new trial, and the new test that I have proposed. In my view, this framework places both an appropriate onus on the movant—namely, by requiring that party to demonstrate relevant substantial noncompliance by the nonmoving party—while also properly placing the burden on the nonmoving party to rebut the presumption that its noncompliance prejudiced the movant by denying that party information or evidence material to the issues at trial or the movant's preparation thereof. I feel that the standard of a "reasonable probability . . . that the result of a new trial will be different," now adopted by the majority, is much too onerous a standard for the moving party for three reasons. First, who can prove such a future outcome in a trial? The vagaries of both the jury system and court trials defy predictability, so the focus should be on the impact of the discovery noncompliance on the trial that has just occurred. Sec-

---

[6] Under *Varley*, relief, such as in the form of a new trial, "will only be granted if the unsuccessful party is not barred by any of the following restrictions: (1) There must have been no laches or unreasonable delay by the injured party after the fraud was discovered. (2) There must have been diligence in the original action, that is, diligence in trying to discover and expose the fraud. (3) There must be clear proof of the perjury or fraud. (4) There must be a substantial likelihood that the result of the new trial will be different." *Varley* v. *Varley*, supra, 180 Conn. 4. Within the context of marital dissolution, this court has abandoned the second requirement. See *Billington* v. *Billington*, 220 Conn. 212, 218, 595 A.2d 1377 (1991).

[7] The test set forth in *Varley* also applies to newly discovered evidence. I would retain the test insofar as it applies to newly discovered evidence, since that issue is not before us at this time.

ond, as a reasonable probability suggests the necessary showing is more likely than not, I believe the burden is too high and improperly denies the movant a new trial where he or she has a plausible chance of prevailing. Third, I believe that the placement of a threshold burden on the aggrieved party and a rebuttal burden on the noncompliant party is more equitable to the parties and the trial court making the final decision. In my view, "[a]s between guilty and innocent parties, the difficulties created by the absence of evidence should fall squarely upon the former." *Anderson* v. *Cryovac, Inc.*, 862 F.2d 910, 925 (1st Cir. 1988).[8] My proposed standard accomplishes this, while the majority's framework does not.

I find instructive other recent decisions of this court in which we have concluded that, as between an innocent party and a wrongdoer, the latter should bear the burden of establishing that their wrongful conduct did not prejudice the innocent party. Thus, for instance, in creating the tort of intentional spoliation of evidence, this court devised a burden shifting scheme under which the plaintiff first "must prove that the [defendant's] intentional, bad faith destruction of evidence rendered the plaintiff unable to establish a prima facie case in the underlying litigation." *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 246, 905 A.2d 1165 (2006). "Once the plaintiff satisfies this burden, there arises a rebuttable presumption that but for the fact of the spoliation of evidence the plaintiff would have recovered in the pending or potential litigation . . . ." (Internal quotation marks omitted.) Id., 247. "The defendant may rebut this presumption by producing evidence showing that the plaintiff would not have prevailed

---

[8] I agree with the majority that we should not adopt the rule set forth in *Anderson*. Although I agree with part of the test in *Anderson*, I disagree with its requirement that parties must show deliberate misconduct by clear and convincing evidence. In this regard, I believe that *Anderson* sets too high a burden for an innocent party.

in the underlying action even if the lost or destroyed evidence had been available." (Internal quotation marks omitted.) Id., 247–48. This burden shifting framework acknowledged "the difficulties of proof inherent in the tort of intentional spoliation of evidence"; id., 246; and, as with the creation of the cause of action itself, stemmed from "[t]he most elementary conceptions of justice and public policy [requiring] that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (Internal quotation marks omitted.) Id., 245.

Similarly, in *Ramin* v. *Ramin*, 281 Conn. 324, 348, 915 A.2d 790 (2007), this court was presented with the question of which party should bear "the burden of establishing the harm flowing from the trial court's error," namely, that court's improper refusal to consider the plaintiff's motion for contempt and sanctions against the defendant regarding his repeated failure to comply with the court's discovery orders. In electing to place the burden on the wrongdoer, rather than the party claiming error, we reasoned that "it would be grossly unfair to the plaintiff to require her to establish precisely how she was harmed in proving her case by not having access" to the withheld materials when the plaintiff never had access to that information because the trial court refused to consider her motion regarding the defendant's discovery conduct. Id. Additionally, because "the defendant remained in total control of all of the materials sought by the plaintiff and ordered to be disclosed to her by the court . . . [the defendant] reasonably could be expected to be able to establish that the materials would not have helped the plaintiff prove her case."[9] Id., 349. Thus, the court in *Ramin* held

___

[9] I note that the *Ramin* case was specifically limited on its facts to family cases. *Ramin* v. *Ramin*, supra, 281 Conn. 349. I cite the case, however, for the philosophical principle that the burden to show immateriality should be placed on the wrongdoer, a position that this court has endorsed in certain circumstances over the past several years. I would extend this policy to all civil cases.

## that the party who committed discovery misconduct

The rules of practice on disclosure apply equally to both civil and family matters. Practice Book § 25-31 provides: "The provisions of Sections 13-1 through13-11 inclusive, 13-13 through 13-16 inclusive, and 13-17 through 13-32 of the rules of practice inclusive, shall apply to family matters as defined in Section 25-1." All of the aforementioned sections refer to the disclosure procedures in civil matters. I also note that Practice Book § 13-14, which deals with sanctions for nondisclosure, is also incorporated in Practice Book § 25-31 of the family discovery section.

I note that although the majority emphasizes the role in our *Ramin* decision of the "heightened duty to disclose in marital cases," the issues of what makes a party a wrongdoer, and whether the wrongdoer or innocent party bears the burden of showing immateriality, are entirely distinct. The question that I pose to the majority is, if the rules of practice apply equally to both civil and family matters, why should our test regarding the burdens of discovery noncompliance be different? I note further that in *Ramin* the plaintiff filed a motion in limine seeking sanctions pursuant to Practice Book § 13-14, which is contained in the civil section. I fail to see, as the majority suggests, that the extraction of "general jurisprudential principles from *Ramin* can result only in a misapplication of our law." See footnote 19 of the majority opinion. Although the majority does not explain this conclusion, I would maintain that the general jurisprudential principles in *Ramin* are sound. Although contained in our case law, the Practice Book does not promulgate a higher standard of disclosure in family as opposed to civil matters. I would suggest that all counsel, practicing in any area of the law, have a duty to comply with our rules of practice and provide the other side with full disclosure.

I also dispute the majority's contention that it is relevant that, "[u]nlike civil litigants who stand at arm's length from one another, marital litigants have a duty of full and frank disclosure analogous to the relationship of fiduciary to beneficiary . . . ." (Internal quotation marks omitted.) Our holding in *Ramin* that a special duty of "full and frank mutual disclosure" may arise out of the marital relationship may be correct; *Ramin* v. *Ramin*, supra, 281 Conn. 349; but it is irrelevant to the fact that all civil litigants have a duty of full disclosure arising out of our policy, expressed in our rules of practice, mandating full and accurate disclosure and production of materials requested during discovery as an essential component of a fair trial. Full disclosure may or may not be frank, but the claim in the present case is that the defendant did not provide full disclosure.

Likewise, the role of independence of interests implied by the majority's embrace of the "arm's length" aspect of civil litigation in contrast to marital litigation, is a red herring. This aspect of our holding in *Ramin* is relevant to a marital litigant's duty of frankness of disclosure—not fullness—in the discovery process, and therefore goes to determination of when discovery noncompliance occurs in the marital litigation context. The choice of which party bears the burden of noncompliance is unrelated, and is based on our

should bear the burden of proving its misconduct was

reasoning that it would be "grossly unfair" to require the victim of discovery misconduct to have the burden of proving harm.

The majority suggests that my "analogy of the present case to the interests at issue in spoliation cases conflates intentional destruction of evidence with mere nondisclosure, harms that differ vastly in nature and related policy concerns. Like subornation of perjury, not only is the nature of the harm different, but the nature of the act itself is more egregious." See footnote 18 of the majority opinion. This reasoning is similar to the majority's opinion that *Ramin* presents a unique set of facts upon which to carve an exception. While I agree that intentional spoliation is more egregious than negligent nondisclosure, it may be the equivalent of intentional nondisclosure. I am of the opinion, however, that the failure to comply with our discovery rules, whether intentional, negligent or accidental, has a similar impact on the innocent party's opportunity for a fair trial, and therefore warrants the burden shifting approach. The egregiousness of the act implicates the separate but related issue of attorney discipline. It is too difficult for the innocent party to prove fraud or intentional misconduct, and it is a bizarre standard to set when the impact on the innocent party's opportunity for a fair trial has no necessary connection with the mens rea underlying the discovery noncompliance. The more appropriate standard, in my view, is substantial noncompliance of relevant material under the test which I propose.

The majority further suggests that our holding in *Ramin* is narrower than I suggest because it involved a trial court's error in refusing to hear a motion duly filed. In my view, the problem with embracing general jurisprudential principles in the context of "exceptional circumstances" only is that they do not provide any real guidance to Superior Court judges regarding when the burden shifting will occur. For instance, we know that burden shifting occurs for the intentional spoliation of evidence. When, however, does nondisclosure occur in the family setting? Is it only when a court refuses to hear a motion duly filed? Does it only occur when a party is required to file five motions for contempt based upon discovery noncompliance? Does it occur when individual judges find that the acts are egregious? I propose a new rule because I believe that it both promotes compliance with our Practice Book and supports the principle of fairness that is inherent in our rules of practice. I believe that it also provides the necessary guidance to the trial court regarding both the time and the manner in which the rule should be followed.

Further, this court has suggested potential burden shifting, albeit in dicta, in other types of cases. Thus, in *Burger & Burger, Inc.* v. *Murren*, 202 Conn. 660, 668, 522 A.2d 812 (1987), which involved a potential error in the disqualification of an attorney, we stated that "[a]lthough we decline to set forth at this time the standard of review in an appeal from a final judgment where error is claimed in the granting of a disqualification order, we do recognize the problems inherent in requiring a litigant to establish prejudice

harmless. Id., 348–49. That court reasoned that it was "grossly unfair" to require the victim of discovery misconduct to have the burden of proving harm. Id., 348. In my view, this is another way of saying that the victim of discovery noncompliance (I prefer to use the term noncompliance rather than misconduct because I believe that intent is irrelevant to the harm suffered) should not have to show that the noncompliance was result altering. Indeed, how does a party make such a showing when its claim is that the discovery noncompliance prevented it from having the materials or information necessary to carry that burden? I believe that the test that I have offered presents a more equitable approach to the problem.

I would conclude that these and other policy considerations support the principle that the allegedly noncompliant party should bear the burden of rebutting the presumption that its substantial noncompliance with the movant's discovery requests was material to the issues at trial, including the movant's full and fair preparation thereof. First, the nonmoving party, as the noncompliant party, should bear the risk of uncertainty, including the potential for a new trial, which follows

on appeal. Demonstrating that the outcome of a trial has been affected by an erroneous disqualification of counsel rather than by the other myriad variables present in civil litigation concededly would impose a difficult burden on a losing litigant. . . . This factor, coupled with the fact that the right to counsel of one's choice, although not absolute, is a fundamental premise of our adversary system . . . may well require us to place the burden of disproving prejudice on the party who has been advantaged by an erroneous disqualification." (Citations omitted; internal quotation marks omitted.) Likewise, once the threshold burden has been met by the movant, I propose to place the burden of rebuttal on the party advantaged by the noncompliance. I have suggested the aforesaid test because I believe that our rules become weakened and, at times, meaningless, unless there are consequences for noncompliance. Although the majority suggests, appropriately, that the Practice Book provides for sanctions in the event of noncompliance, I maintain that our test for a new trial should conform to the rules of practice to provide additional elements of both consistency and enforcement power to the rules of practice.

in the wake of its noncompliant conduct. As between the noncompliant party, which operates under obligations imposed by our rules of practice to produce and disclose requested information; see Practice Book §§ 13-7, 13-10 and 13-15; and the movant adversely affected by incomplete discovery production, I would conclude, as this court did in *Rizzuto*, that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (Internal quotation marks omitted.) *Rizzuto* v. *Davidson Ladders, Inc.*, supra, 280 Conn. 245.

Second, placing the burden on the noncompliant party to demonstrate that its substantial noncompliance was not material to the issues at trial is, under the circumstances, more likely to assist the trial court in evaluating the impact that the unproduced information would have had, either on the trial, or on the movant's preparation in support thereof. This is true because the noncompliant party, as the party continuously in possession of the unproduced information, would be in the best position to articulate and "establish that the [requested but unproduced or undisclosed] materials would not have helped the [movant] prove her case." *Ramin* v. *Ramin*, supra, 281 Conn. 349. Similarly, "it would be grossly unfair to the [movant] to require her to establish precisely how she was harmed in proving her case" when the movant never had access to, or possibly an awareness of, information undisclosed or unproduced during trial but thereafter discovered. Id., 348.

Third, shifting the burden onto the noncompliant party to disprove the adverse presumption promotes the policy of full compliance with discovery requests set forth in our rules of practice. See Practice Book

§§ 13-7, 13-10 and 13-15.[10] The disapproval of incomplete or noncompliant discovery is expressed in Practice Book § 13-14, which provides an aggrieved party with various remedies for nondisclosure uncovered in the period leading up to and including trial. Our policy mandating full and accurate disclosure and production of materials requested during discovery as an essential component of a fair trial is, in my view, equally valid when noncompliance that occurs before or during trial is discovered afterward. This renders the proceeding amenable to a motion for a new trial on the basis of discovery noncompliance because the fairness of that proceeding is called into question when the movant was denied full and complete discovery disclosure and production. Such disclosure and production may have been helpful to the movant's case at trial, may have been helpful in settlement negotiations, or may have led the movant to other relevant information, through depositions or additional discovery requests.

Fourth, I believe that the aforementioned framework comports with the ethical obligations of counsel pertaining to discovery. Rule 3.4 (1) of the Rules of Professional Conduct provides that an attorney shall not "[u]nlawfully obstruct another party's access to evidence," and rule 3.4 (4) of the Rules of Professional Conduct provides that counsel shall not, "[i]n pretrial procedure . . . fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party . . . ." As the commentary to the rule makes clear: "The procedure of the adversary system contemplates that the evidence in a case is to be marshaled competitively by the contending parties. Fair

---

[10] Practice Book § 13-7 (a) provides that a party's answers to interrogatories "shall be answered under oath," and in the present case the defendant swore that its responses to the plaintiff's interrogatories and requests for production were, to the best of its knowledge and belief, "true, accurate and complete . . . ."

competition in the adversary system is secured by prohibitions against destruction or concealment of evidence .. . . . .

"Documents and other items of evidence are often essential to establish a claim or defense. Subject to evidentiary privileges, the right of an opposing party . . . to obtain evidence through discovery or subpoena is an important procedural right. The exercise of that right can be frustrated if relevant material is altered, concealed or destroyed," or, in my view, simply not produced to the requesting party. Rules of Professional Conduct 3.4, commentary.

In its decision to modify the fourth prong of *Varley*, the majority offers several reasons why any rule other than the one it sets forth should not be adopted. First, the majority notes that its requirement that there exist for civil litigants a "reasonable probability . . . that the result of a new trial will be different," is akin to the burden placed on a criminal defendant, alleging that the prosecution's failure to disclose evidence material to guilt or punishment violated his due process rights, to show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Internal quotation marks omitted.) *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); see also *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Second, the majority claims that their rule comports with our interest in finality of judgments and that any rule disturbing the repose of judgments should be reserved for exceptional circumstances. Third, the majority states that a rule other than theirs "would invite endless litigation and deplete judicial resources." Fourth, the majority claims that, "[g]iven the breadth of discovery in modern trial practice, it is inevitable that the movant could find some fault with the other party's compliance with broadly

phrased discovery requests," and that requiring the non-compliant party to prove its actions were harmless "would impose an insupportable burden on the non-moving party to disprove amorphous assertions . . . ." For the reasons that follow, I disagree with each of the majority's assertions.

First, although in the criminal context it is the defendant who bears the burden of establishing that he is entitled to a new trial on the basis of a violation of his right under *Brady* v. *Maryland*, supra, 373 U.S. 87, to disclosure of material evidence,[11] I would conclude that under our civil rules of practice, it is the noncompliant party, as the wrongdoer, that should bear the burden of establishing that its failure to disclose information or produce evidence did not aggrieve the otherwise innocent movant. Whereas the considerations underlying *Brady* include questions of federal constitutional law, and procedural and substantive due process rights of criminal defendants,[12] the present case involves questions of state civil procedure and whether this court wishes to adopt a change, consistent with our rules of practice, on the basis of policy considerations.[13]

---

[11] I note that the majority opinion does not contain a complete quotation of the test set forth in *Bagley* for when a defendant will receive a new trial on the basis of a violation of his *Brady* right. Although the test references whether the result of the trial would have been different, the focus of the test is whether the evidence that the prosecution failed to disclose was *material*. The full formulation of the test is as follows: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States* v. *Bagley*, supra, 473 U.S. 682.

[12] I note that, similar to the framework that I propose, the test governing whether a defendant is entitled to a new trial on the basis of a prosecutor's nondisclosure of material evidence applies regardless of whether the failure to disclose was intentional or merely negligent. See *United States* v. *Bagley*, supra, 473 U.S. 682 (test "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases").

[13] Relevant differences between criminal and civil cases are myriad. At a minimum, the following three differences are relevant to our policy considerations: (1) the prosecutor in a criminal case must prove guilt beyond a reasonable doubt, while the plaintiff in a civil case must establish her claim

Although sparingly employed, this court certainly has the power to adopt rules, tests or orders that it deems appropriate to enhance the fair administration of justice in this state. See *In re Joseph W.*, 301 Conn. 245, 268, 21 A.3d 723 (2011); *State* v. *Garcia*, 299 Conn. 39, 61 n.13, 7 A.3d 355 (2010); *State* v. *Lockhart*, 298 Conn. 537, 576, 4 A.3d 1176 (2010). Further, the majority offers no explanation why its test focuses on the likelihood of a different result at a new trial, rather than, as in *Brady*, whether the result of the original proceeding would have been different had the evidence been disclosed to the defense. Accordingly, I do not find the federal criminal standard instructive in this matter or in conflict with the framework that I propose.

Second, as to finality, I initially note that, under our rules of practice, a motion for a new trial must be filed within ten days after a verdict is accepted. Practice Book § 16-35. In this short span of time, reliance on the judgment would likely have been minimal and, therefore, a possibly improperly obtained verdict in favor of the allegedly noncompliant party should not be upheld in favor of repose. For the same reason, although the verdict may be "final," we must balance the admittedly strong interests underpinning the principles of finality and repose of judgments with the equally strong principle that parties must comply with our rules of practice in order to ensure that both sides are afforded the fair trial to which all sides are entitled. According to the majority's reasoning, if a movant satisfies its test by demonstrating a reasonable probability that the undisclosed or unproduced information would yield a different result in a new trial, then a "good and compelling

by a preponderance of the evidence; (2) the defendant in a criminal case may have liberty at stake, while the defendant in a civil case risks only the loss of property, a lesser interest; and (3) a prevailing plaintiff in a civil case may be aggrieved by discovery noncompliance where the recovery is less than it might otherwise have been, while a prevailing criminal defendant, found not guilty, could not be so aggrieved.

reason" exists; *Steve Viglione Sheet Metal Co. v. Sakon-chick*, 190 Conn. 707, 713, 462 A.2d 1037 (1983); warranting the disturbing of finality through the granting of a motion for a new trial. I, too, would conclude that undisclosed or unproduced information that would have been substantially responsive to discovery requests and was found to be material to the issues at trial, unrebutted by the noncompliant party, constitutes a "good and compelling reason" warranting the granting of a motion for a new trial. Id. My disagreement with the majority instead concerns, first, on which trial the impact of the noncompliance is measured, second, the likelihood that the result was affected by the noncompliance, and third, which party, in supporting or opposing a motion for a new trial, should bear the burden of disproving the presumption, either the present presumption in favor of finality and upholding the judgment, or my proposed presumption in favor of a new trial on the basis of relevant substantial discovery noncompliance. In my view, creating a presumption that discovery noncompliance was material to the issues at trial and placing the burden on the noncompliant party to marshal arguments in favor of upholding the result of the trial, rather than placing the onus on the innocent movant who may have been denied a full and fair proceeding to show a reasonable probability of success at a hypothetical new trial, does not undermine the interests in favor of finality or the repose of judgments. To the extent that the framework that I propose is contrary to these considerations, the importance of assuring disappointed litigants that an unfavorable verdict results from a full and fair trial wherein all of the material information was disclosed, evidence produced and facts and witnesses marshaled, should trump our normal deference to finality when substantial discovery noncompliance has occurred.

Third, I disagree that adopting a rule other than the one established in *Varley*, and modified today, will

"invite endless litigation and deplete judicial resources," an assertion essentially making a "floodgates" claim. If we balance, on the one hand, the right of any party to full disclosure and production, which is essential to ensuring a fair trial, versus, on the other hand, the claim that expresses fear that a new rule will lead to numerous motions for a new trial on the basis of discovery noncompliance, the right of a party to full disclosure and a fair trial must, in my opinion, prevail. Indeed, because a motion for a new trial must be filed within ten days in the absence of an extension for good cause; Practice Book § 16-35; the likelihood that the innocent party will discover the noncompliance on the part of the wrongdoer within that time period is remote. To the extent that the framework I propose may result in the filing and granting of additional motions for a new trial, this result should be welcomed as the proper outcome, in that justice is served when a verdict tainted by the nonmoving party's substantial noncompliance is purged and that party is required to bear "the difficulties created by the absence of evidence" resulting from its noncompliance. *Anderson* v. *Cryovac, Inc.*, supra, 862 F.2d 925. Moreover, although the standard I set forth creates a presumption in favor of the movant as the innocent party, the framework still places an onus on the movant to demonstrate that the undisclosed or unproduced evidence was both substantially noncompliant to its discovery requests and relevant to the trier of fact's ultimate determination. Once the innocent party has made this prima facie showing to the satisfaction of the trial court and the presumption of materiality is established, the nonmoving party then has the opportunity to rebut this presumption by demonstrating that the evidence, although responsive, was not material to the case if it had been disclosed or produced, by establishing that there is no reasonable possibility that the result of the trial could have been different. I there-

fore reject the notion that replacing the *Varley* test, in its entirety, will result in the opening of the floodgates to improper motions for a new trial.

Fourth, I reject the claim that no standard other than that set forth by the majority is proper because, "[g]iven the breadth of discovery in modern trial practice, it is inevitable that the movant could find some fault with the other party's compliance with broadly phased discovery requests," and because requiring the nonmoving party to prove that its noncompliance was not material "would impose an insupportable burden on [that] party to disprove amorphous assertions . . . ." Although I disagree that in modern discovery practice it is "inevitable" that fault can be found, even if such a fact were true, that inevitability should not excuse either the noncompliant party's conduct or its failure to abide by our rules of practice governing compliance with discovery requests. Indeed, a rule stating otherwise would reward such practices during discovery in the hope that, following an unfavorable verdict, the innocent party would be unable to demonstrate precisely that there was a "reasonable probability . . . that the result of a new trial will be different." Such an outcome would seem to grant the noncompliant party two bites at the apple— once during trial and once during the movant's motion for a new trial—as an incentive to reward the noncompliance.

Additionally, under the framework that I propose, the burden placed on the noncompliant party is far from "insupportable," and that party would not be required to disprove "amorphous" assertions.[14] Instead, the movant

[14] The focus of the majority's new test on the potential impact of remedying the discovery noncompliance at a new trial belies its concern for the burdened party's difficulty in disproving "amorphous" assertions. Whatever the challenges of evaluating the impact of a discovery violation on a past proceeding, the prognostication of a different result at a new trial is unavoidably additionally complicated by the unpredictability of any new jury and any revised trial strategy of both parties, but particularly that of the party disappointed with its results in the first trial. In the context of any close

would first be required to demonstrate specifically how the undisclosed or unproduced information was substantially nonresponsive to its discovery requests, and also must establish that such material was relevant to the trial court's ultimate determination. The requirement that the noncompliance be substantial, in my view, responds to the majority's concerns that in view of modern trial practice's "broadly phrased discovery requests," it is inevitable that some items will be missed in discovery. The noncompliant party could disagree by seeking to demonstrate that the undisclosed or unproduced information was not requested in the discovery requests, or that the discovery requests were too vague for it to have known that the information produced was not responsive. Further, the noncompliant party could assert that the noncompliance was not substantial. The noncompliant party could also argue that the request was not relevant to the trial court's ultimate determination. It would then fall to the trial court to determine whether, in fact, the movant's claim was true that the undisclosed or unproduced information should have been produced, or whether the noncompliant party successfully demonstrated that the production was substantially responsive to the discovery requests, or that the requests themselves were too vague. I therefore disagree with the notion that any test, other than that set forth by the majority, is unworkable

case, who is to say that there does not exist a reasonable probability of a different result at any new trial?

This concern is further belied by the majority's claim that the framework that I propose would only affect the result in the "rare case" where "the fact finder, after weighing the evidence, finds its mind in perfect equipoise." (Internal quotation marks omitted.) See footnote 11 of the majority opinion. Either the burdened party faces difficulty disproving an "amorphous" assertion that there is a reasonable probability or possibility that discovery noncompliance did or did not, could or could not, or will or will not, affect the result at the past or future trial, or the evidence is easily presented and weighed by a fact finder capable of discerning "perfect equipoise." The majority claims to have it both ways.

because of the "breadth of discovery in modern trial practice," or that it would place an insupportable burden on the noncompliant party.[15] I believe that the test that I propose comports with the Practice Book in that the Practice Book: first, does not require intentional misconduct for the imposition of sanctions; and second, requires a failure to comply substantially with any discovery order made pursuant to §§ 13-6 through 13-11 to impose sanctions. See Practice Book § 13-14.[16]

In light of the fact that I would substitute the aforementioned framework for the existing test set forth in *Varley*, I would remand the case to the Appellate Court with direction to remand the case to the trial court in order to permit the parties to present additional arguments before that court tailored to this new standard. See *State* v. *Winot*, 294 Conn. 753, 762 n.7, 988 A.2d 188 (2010) (noting that cases appealed subsequent to prior decision of this court establishing new rule required reversal and remand for new trials in order to have correct instruction read to jury and to permit party opportunity to present evidence and arguments under new rule). Specifically, a remand in this case is proper because the framework I propose sets forth a threshold burden on the movant to create a presumption that the undisclosed or unproduced information was material to the issues at trial, and places a burden on the noncompliant party to rebut that presumption.[17] A remand

[15] I note that attorneys have the right to object to discovery requests considered vague or confusing. See Practice Book §§ 13-8 and 13-10 (b). If the parties cannot agree as to the merits of the objection, the trial court can determine, in the first instance, the appropriateness of the request. Practice Book § 13-10 (c).

[16] I note that the majority has cited certain provisions of the rules of practice as a suggestion that its standard does not invite noncompliance. I believe, however, that the standard that I have proposed is more likely to encourage a more consistent approach to the remedies for discovery noncompliance in line with the intent of the rules of practice.

[17] Although the trial court concluded that the anonymous note would not have resulted in a different outcome and that the two undisclosed complaints were cumulative, the trial court made these conclusions and the predicate

would allow the trial court to review the parties' new arguments and to reconsider the plaintiff's motion for a new trial under the aforementioned framework.

For all of the foregoing reasons, I would reverse the judgment of the Appellate Court and remand the case to that court with direction to remand the case to the trial court for further proceedings in accordance with the aforementioned framework.

I therefore respectfully dissent.

findings pursuant to *Varley*, under which the plaintiff bore the burden of demonstrating a substantial likelihood that the result of the new trial would be different. The framework that I propose, by reducing the threshold burden on the movant and creating a presumption of materiality once that threshold burden is met, thus creating a burden to rebut for the noncompliant party, changes the trial court's considerations and, in a close case, these new considerations could weigh in favor of granting the motion for a new trial. The trial court itself found that "[t]here is no question that [the Osten and Jackson complaints] were germane to the case and requested in discovery. There is also no question that none of these documents were produced by the defendant, although they should have been. Certainly the details of the complaints could have been used to test the credibility of [Valade and Kelley] at trial."

I also note that the trial court held that the items were "merely cumulative to other evidence introduced at trial and would not have produced a different result." Although the court engaged in some discussion regarding the note and the Osten investigation, there was no discussion regarding the Jackson complaint, other than the conclusory statement that it was cumulative. We are left to speculate why it was cumulative. The fact that, after the note was produced, the plaintiff "was granted a recess to consider what actions to take," contrary to the majority's position, in my view, is of little consequence. In my opinion, the important point is that had these documents been produced in the normal course, as they should have been, the plaintiff could have performed more discovery, taken depositions, and potentially prepared her trial strategy in a different manner. This opportunity was lost by the defendant's noncompliance. In my view, this court, through the use of the test it employs, should not countenance such neglect when it affects the ability of one party to receive a full and fair trial on the merits. Accordingly, I am disinclined to apply the majority's framework to the existing record and the trial court's memorandum of decision. I note, however, that the framework that I propose would be amenable to appellate application as a matter of law in future appeals wherein an appellate court was called upon to review a trial court's decision under the framework.